492 P.2d 750

**The STATE of Arizona, Appellee,**

v.

**Melvin Charles KROUPA, Appellant.**
**No. 2 CA–CR 266.**

Court of Appeals of Arizona, Division 2.

Jan. 20, 1972.

Rehearing Denied Feb. 16, 1972.

Review Denied March 14, 1972.

Gary K. Nelson, Atty. Gen., by John S. O'Dowd, Asst. Atty. Gen., Tucson, for appellee.

Howard A. Kashman, Pima County Public Defender, by Eleanor Daru Schorr, Deputy Public Defender, Tucson, for appellant.

HOWARD, Judge.

Contrary to his plea the defendant was convicted by a jury of the crime of second degree burglary and sentenced by the court to a term in the Arizona State Prison of not less than four nor more than five years.

The issues in this case concern the admissibility of defendant's oral and written confessions and the failure of the court to order any mental examination of defendant. The facts shall be recited as they concern the specific issues.

## THE ADMISSION OF THE CONFESSIONS

On November 22, 1970, the defendant was apprehended by the police in the act of burglarizing the National Metals Company in Tucson, Arizona. Upon apprehension he was placed in the rear of a patrol car together with an accomplice. Officer Jennings of the Tucson Police Department warned both the defendant and his accomplice of their "Miranda rights" and upon being asked whether or not they wished to say anything, both indicated that they did not. Officer Jennings then left the patrol car and upon returning a conversation was initiated by the defendant. On direct examination Officer Jennings, at a voluntariness hearing out of the presence of the jury, testified:

"Q. Okay. Do you recall what the subject of the conversation was generally or do you recall any of the specific questions that he asked you?

A. Well, basically he was asking me about how he would make bond in a case like this since he was from out of state and unknown by practically everybody in the state. In other words, he had nobody here to use as a reference.

Q. Okay. This I assume was a two-way conversation. Did you say anything back to the defendant?

A. Yes. As best as I could I tried to answer him.

Q. Okay. Did this conversation—where did this conversation go from that point? Was there anything further to it?

A. After a few minutes of just the general conversation Mr. Kroupa indicated to me that he didn't want to say anything where he was at that time.

Q. Okay. And what happened?

A. He was taken out of the car and to another area.

Q. ·And what occurred at the other area?

A. Well, I then asked him some questions to which he answered."

On cross-examination the following questions were asked by defendant's attorney and answered by Officer Jennings:

"Q. . . . You stated that the defendant Mr. Kroupa said he didn't want to speak where he was at or something to that effect. Can you recall exactly what he said?

A. No, I can't. It was as much by word as by gesture.

Q. What was the gesture that he used?

A. The eyes mainly.

Q. Could you go through exactly what he did if you can recall, how he told you by using his eyes he wanted to speak some other place?

A. I knew what he wanted by the words and I knew for sure by the eyes. It was a spontaneous reaction of both his gestures and his words. He would start a sentence and then not complete it because he wanted to get my attention but he told me that he didn't want to sit there with his eyes. It was clear to me what he meant.

Q. An then you looked right at his eyes and you could tell by his eyes he meant to go some place else; is that right?

A. Yes."

After Officer Jennings started to speak with the defendant in the rear of the auto, another officer, Officer Walsh, appeared on the scene. Officer Walsh again read defendant his "Miranda rights" and the defendant indicated that he wanted to speak to Officer Walsh. At a later time a written confession was taken from the defendant which contains his signature and a written waiver of his "Miranda rights."

At the conclusion of the voluntariness hearing, the trial judge found, beyond a reasonable doubt, that the defendant was properly and fully advised of his constitutional rights, that he understood them, that he waived his constitutional rights and that his statements were wilfully and voluntarily made.

In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the court stated:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473–474, 86 S.Ct. at 1627, 16 L.Ed.2d at 723.

Citing the cases of People v. Randall, 1 Cal.3d 948, 83 Cal.Rptr. 658, 464 P.2d 114 (1970); People v. Ireland, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969) and People v. Fioritto, 68 Cal.2d 714, 68 Cal. Rptr. 817, 441 P.2d 625 (1968), the defendant contends that the oral and written confessions were secured in violation of his constitutional rights since he initially indicated to the police that he did not desire to say anything.

We do not agree. In all the cases upon which the defendant relies, the

initiation of interrogation after the assertion of Fifth Amendment privileges came from the State and not the defendant. That is not true in the case at hand. Volunteered statements of any kind are not, barred by the Fifth Amendment and their admissibility is not affected by the holding in *Miranda*. *See* Miranda v. Arizona, supra, 384 U.S. at 478, 86 S.Ct. 1602, 16 L. Ed.2d at 725–726. A change of mind on the part of the defendant prompted by his own psychological makeup and not by continued interrogation and efforts to convince the defendant to communicate with the officers is not proscribed by *Miranda*. People v. Randall, supra; People v. Ireland, supra. At the voluntariness hearing the defendant testified. He did not in any manner contradict the testimony of the police officers. Rather, his testimony was that he did not remember anything since he was under the influence of drugs. This brings us to his next contention, which is that he was unable to waive any of his "Miranda rights" because of being under the influence of drugs.

At the voluntariness hearing the defendant testified that he remembered nothing of the day of November 22, 1970, and that all he remembered was waking up in the hospital two days later. He testified that he had been "shooting" cocaine and heroin and that while he was in the hospital he want into withdrawal symptoms. The police officers testified that on November 25, 1970, the defendant told them that he was on cocaine. However, both officers testified that when the oral and written confessions were made the defendant appeared normal and did not appear to be under the influence of any narcotic drugs.

The case of State v. McFall, 103 Ariz. 234, 439 P.2d 805 (1968), cited by the defendant as authority for the invalidity of his confession, is not in point. In State v. McFall, supra, there was an insinuation on the part of the police that if the defendant were to give a confession they would provide him with the use of some drugs in order to prevent the withdrawal symptoms. No such facts exist in the case at bench. We believe that the case of State v. Brady, 105 Ariz. 592, 469 P.2d 77 (1970) is more appropriate to the facts in this case. *Brady* makes it clear that the mere fact that one is voluntarily under the influence of drugs, without more, does not prevent the admissibility of a confession.

■ The trial judge in this case heard all the evidence surrounding the defendant's statements. He concluded that the defendant was fully advised of his constitutional rights and that he effectively waived them. We think the evidence in this case was sufficient to support his finding.

## FAILURE TO CONDUCT A MENTAL EXAMINATION

A.R.S. § 13–1621, subsec. C, as amended, provides for a mental examination of the defendant if the court determines that reasonable grounds exist to believe that the defendant suffers from a mental illness the effect of which renders him unable to understand the proceedings against him or to assist in his own defense.

■■ At a hearing on a motion pursuant to A.R.S. § 13–1621, defendant testified that his wife and parents had several times tried to have him committed but he was never in fact committed because "they have had warrants issued for me, but I have never showed up." He also testified that he went to a special school for slow learners. The granting of an order for mental examination under A.R.S. § 13–1621 is within the sound discretion of the trial court. State v. Bradley, 102 Ariz. 482, 433 P.2d 273 (1967). The trial court did not err in refusing to order a mental examination.

Affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.