529 P.2d 1174

The STATE of Arizona, Appellant,

v.

Mary Yvonne EDWARDS, Appellee.

No. 3002.

Supreme Court of Arizona,
En Banc.

Dec. 23, 1974.
Rehearing Denied Jan. 28, 1975.

N. Warner Lee, Atty. Gen., Phoenix, Dennis DeConcini, Pima County Atty. by

Michael P. Callahan, Deputy County Atty., Tucson, for appellant.

David S. Hoffman, Tucson, for appellee.

HAYS, Chief Justice.

We have determined that we must affirm the lower court's granting of the defendant's motion to suppress. We thought that it had long ago become unnecessary to remind the police departments of this state of the requirements of the United States Constitution as interpreted by the United States Supreme Court, particularly with regard to the privilege against self-incrimination and the right to counsel.

At the hearing on the defendant's motion to suppress, the following facts came out:

On July 12, 1973, at approximately 10:20 P.M., officers of the Tucson Police Department stopped the car of Mary Yvonne Edwards, the appellee, and without a warrant arrested her for the alleged murder of Catherine Faulkner. Edwards was informed of her rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and she immediately requested an attorney. She was then driven to her home by the police where she obtained the name of a lawyer. After receiving this name, Edwards was informed that the police would contact him for her. During the hour at the house, however, the police made little or no effort to reach an attorney and continued to question Edwards. They also seized the dress that Edwards had been wearing earlier and then took her to the scene of the homicide. The victim, Faulkner, had been shot five times and her body partially burned. Fires had been started at two other places in the house.

Edwards was then taken to the Tucson Police Department interrogation room. While she was being urged to take a polygraph examination, she asked again to speak to a lawyer.[1] The detective ignored this and indicated that a refusal to take the test was tantamount to an admission of

---

1. Many of the conversations between Edwards and members of the police department were taped. The tapes and transcripts thereof are in evidence and before this court.

guilt. She finally took the examination at 1:45 A.M. The interrogation continued until appoximately 5:30 A.M., at which time the county attorney refused to issue a complaint and Edwards was released shortly thereafter. She had asked for counsel approximately five times while in custody and had attempted to exercise her right to remain silent by answering questions selectively. Later that morning she was able to retain an attorney.

On July 25 and July 26, Edwards was contacted by a detective on the admitted pretense of investigating a previous complaint that Edwards had made when a bullet was shot through her window. On July 25, at the Edwards' home, the detective questioned her about the murder case. On July 26 the detective waited for Edwards as she left her place of work and showed her the grisly pictures of the body of the victim at the scene and during the autopsy, with the admitted intent of "breaking her down." Edwards told the detective that her attorney had told her not to talk with anyone, but the officer continued to question her.

On August 2, Edwards' attorney asked the police if they planned to arrest her during the following Friday evening and week end for the attorney planned to be out of town if not. The police said no but thereafter arrested her at approximately 6:00 P.M. the following night at her place of work. This arrest was made without a warrant and despite the fact that the county attorney had earlier refused to authorize a complaint. Edwards protested that the police had told the attorney that she would not be arrested and asked to be allowed to call another attorney whose name her attorney had given her in case of need. This name was on a slip of paper in her purse which had been taken from her and was not returned to her until later. The detectives questioned her for about an hour at her place of work and then took her to the police station. Several detectives talked with her, urged her to talk,[2] and reviewed the evidence that they had against her, including the dress seized earlier and the results of the prior polygraph examination. Edwards was placed in the Pima County Jail the night of August 3, saw the police again for several hours on August 4 and finally, on August 5, she confessed to the murder. Until that point she had asked to see her attorney several more times and had selectively continued to exercise her right to remain silent.

The defendant made a timely motion to suppress before the lower court which motion was granted after a nine-day hearing.

The State in its appeal raises several questions:

(1) Was the seizure of evidence by the police on July 12 a lawful seizure?

(2) Were the results of the polygraphic examination lawfully obtained?

(3) Were statements obtained from Edwards from July 12 through August 5 lawfully obtained?

(4) Was the confession voluntary and in compliance with Miranda v. Arizona, *supra*?

All these questions must be answered in the negative. We therefore affirm the lower court's granting of defendant's motion to suppress.

■■■■ Edwards was first under arrest the night of July 12 when her car was stopped by the police. Although she was not formally placed under arrest for several hours, an arrest is complete when the suspect's liberty of movement is interrupt-

2. "Q. You got the impression from the very first time you met Mary Yvonne Edwards that she didn't want to talk to you about this case; didn't you?
"A. Yes. I would say that, yes, sir.
"Q. That she didn't want to talk to the police or to you in any way about this particular case?

"A. Or to anybody, yes, sir.
"Q. And yet you kept at her, if you will, to talk to you about the case?
"A. Yes, sir. This is standard procedure."
(R.T. p. 302. Cross-examination of Detective Mittendorf)

ed and restricted by the officers. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); State ex rel. Flournoy v. Wren, 108 Ariz. 356, 408 P.2d 444 (1972). The lawfulness of a warrantless arrest depends upon whether the facts and circumstances within the knowledge of the arresting officer at the time were sufficient to warrant a man of reasonable caution to believe that a felony had been committed by the person arrested. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L. Ed.2d 726 (1963); State v. Enriquez, 106 Ariz. 304, 475 P.2d 486 (1970). If there was no probable cause to make the arrest, then nothing which occurred after the arrest, including the fruits of any search, can make the arrest lawful or justify the search. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Henry v. United States, *supra*; State v. Enriquez, *supra*. When the validity of an arrest is questioned, the burden is on the state to show that probable cause existed. State v. Enriquez, *supra*. In this case, the officers relied on the information given them by William Snow in stopping Edwards. Snow was the fiance of the victim and a former lover of Edwards, and was himself a suspect until the confession of Edwards. The requirement of probable cause to make a warrantless arrest must be strictly enforced. Henry v. United States, *supra*. The information sufficient to justify such an arrest must come from reasonably trustworthy sources. United States v. Seay, 432 F.2d 395 (5th Cir. 1970), cert. denied, 401 U.S. 942, 91 S.Ct. 949, 28 L. Ed.2d 223. The information gained from Snow, not a particularly trustworthy source and without corroboration, might have justified a suspicion of Edwards, but the standard of probable cause is greater than mere suspicion.[3] Henry v. United States, *supra*; State ex rel. Flournoy v. Wren, *supra*. This standard was not met. The State has not sustained its burden of proof concerning the probable cause to detain

Edwards. Because there was no probable cause for arrest, the seizure of evidence by the police on July 12 was not lawful.

■ Upon being stopped by the police, Edwards requested an attorney. The State concedes that this request was ignored and the questioning continued in violation of her *Miranda* rights. Several times during that night and immediately prior to being given a polygraph examination, she inquired about an attorney. It clearly states in Miranda v. Arizona, *supra,* that if a suspect indicates in any manner at any stage of the process that he wishes the aid of an attorney, "there can be no questioning." 384 U.S. at 445, 86 S.Ct. at 1612. That includes a polygraph examination. Therefore, the results of that test were not lawfully obtained.

■ Edwards also repeatedly indicated that she wished her right to remain silent to be observed. This was true on July 12, July 25, July 26, and August 3–5. If a suspect indicates in any manner that he does not want to be questioned,

> "the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." Miranda v. Arizona, 384 U.S. at 445, 86 S.Ct. at 1612.

All the testimony indicates, however, that the police continued to urge her to talk and that the right to remain silent was interpreted as silence on that particular question or series of questions alone. Her right to remain silent and to have the assistance of counsel having been ignored continually, the statements obtained from Edwards cannot be said to have been lawfully obtained.

■ It has long been the rule in Arizona that confessions are prima facie

---

3. Although it is now hindsight, we note that in his testimony, Snow contradicted many of

the statements attributed to him by the police in their testimony.

involuntary and the burden is upon the State to show that the confession was freely and voluntarily made. State v. Holden, 88 Ariz. 43, 352 P.2d 705 (1960). Furthermore, the trial court's determination of the admissibility of a confession will not be disturbed on appeal unless "clear and manifest" error appears. State v. Pulliam, 87 Ariz. 216, 349 P.2d 781 (1960). The evidence in this case clearly sustains the position of the trial judge and the State has not met its burden.

 It is always a dilemma for society when a choice must be made between putting the freedom of the individual in peril if he is questioned without counsel and being unable to solve a crime if a suspect will not make a statement in cases where it may be reasonable to suspect an individual but there lacks sufficient legal evidence to charge him. See Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1357, 93 L.Ed. 1801 (1949) [opinion of J. Jackson]. It is, however, basic to our system that the State which proposes to convict and punish an individual must produce the evidence against him through the independent efforts of its officers and not by inducing the individual to incriminate himself. Culombe v. Connecticut, 367 U.S. 568, 81 S. Ct. 1860, 6 L.Ed.2d 1037 (1961) [opinion of J. Frankfurter]. While "[n]o single litmus-paper test for constitutionally impermissible interrogation has been evolved", the test remains the test of voluntariness. Culombe v. Conn., 367 U.S. at 601, 81 S.Ct. at 1878. If the confession is the result of a free choice of the individual, then it may be used as evidence against him, but if his will has been overborne and his capacity for decision diminished, then the use of his confession is violative of the principles of due process. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1960).

Where physical pressure was once common, mental pressure is now applied. According to Inbau and Reid,[4] the police manuals instruct the police to act as if any statements made by the suspect would only confirm what the police already know. Questioning is directed to the reason for the act and not to whether it was in fact committed by the suspect. In this atmosphere, the Tucson detectives used a variety of ploys: aggressive domination; sympathy; the common bond of womanhood between a female officer and Edwards; minimizing the moral seriousness of the charge; minimizing the use and necessity of attorneys; threats of psychiatric examinations and commitment; a self-defense rationalization; grim pictures; illegally obtained evidence indicative of guilt; et cetera.

 If the person making the confession claims to have been coerced, the fundamental issue is his state of mind. Miranda v. Arizona, supra. It is apparent from what transpired that by the time that Edwards confessed, she no longer felt she had a right to silence and a right to counsel.[5] Her will was indeed overborne.

4. Inbau & Reid, Criminal Interrogation and Confessions (1962).

5. "Q. And just before that [the confession] happened, what did Detective Bunting say to you, if you recall?
"A. He said that I was pumping him for information: that he was tired of talking to me; tired of wasting his time. He was tire of this case. He said he was going to pack up his stuff and go home and I was going to stay there forever and he would never come and talk to me again.
"Q. Did he mention if you would see anybody else at that time?
"A. He said I would never see anybody else again.

"Q. Did he say anything to you to indicate that by talking to him you could help yourself?
"A. He said, 'This is your last chance to talk to me now. If you don't talk to me now, you will never talk to anyone again.'
"Q. Did you believe him?
"A. Yes.
"Q. Did you ask for your lawyer at that time?
"A. No.
"Q. Why not?
"A. I didn't feel that it would do any good.
"Q. Why, Mary; why didn't you feel asking for your lawyer would do any good?
"A. I had previously asked for him about a dozen times and it hadn't done any good.

The trial court's granting of defendant's motion to suppress is affirmed.

CAMERON, V. C. J., and STRUCK-MEYER and HOLOHAN, JJ., concur.

Note: LOCKWOOD, J., did not participate in the determination of this matter.

"Q. Can you recall now at that point in time, what did you think your rights were, what rights did you have?
"A. I didn't feel I had any rights whatsoever.

"Q. Did you feel like you had a right not to talk to him about the case?
"A. No."
(R.T. pp. 855–56)