579 P.2d 542

**STATE of Arizona, Appellee,**

v.

**James Alan ARNETT, Appellant.**

No. 3684.

Supreme Court of Arizona,
En Banc.

April 14, 1978.

Bruce E. Babbitt, Former Atty. Gen.,
John A. LaSota, Jr., Atty. Gen. by William

J. Schafer III and Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

Thinnes & Rawles by Thomas A. Thinnes, Thomas V. Rawles, Phoenix, for appellant.

HAYS, Justice.

Appellant James Alan Arnett was found guilty of first degree murder by a jury on July 22, 1976. An aggravation-mitigation hearing was held on August 24, 1976; the trial court specifically found that (1) appellant had been previously convicted of an offense for which under Arizona law a sentence of life imprisonment or death was imposable and (2) appellant had been previously convicted of a felony involving the use or threat of violence on another person, thus establishing the aggravating circumstances set forth in A.R.S. § 13–454(E)(1) and (2). (Both of these findings by the trial judge were based on evidence of a prior California conviction for "the crime of lewd and lascivious acts upon a child under the age of 14 years", punishable in that state by one year to life imprisonment. Under A.R.S. § 13–652, a similar act committed "upon or with a child under the age of fifteen years" is punishable by imprisonment for five years to life.) No mitigating circumstances were found, and on September 10, 1976 appellant was sentenced to death. We have jurisdiction of this appeal pursuant to A.R.S. § 13–1711.

Appellant offered no evidence at the trial; the following factual summary is derived from evidence introduced by the State. Additional facts will be referred to herein as they are pertinent to issues presented in this appeal.

During the first week of February, 1976, appellant was staying with a man named Victor Tremblay at Tremblay's residence in Van Nuys, California. On the evening of February 6 Tremblay returned home, laid his wallet and keys on the kitchen table, and proceeded to go to sleep in the living room. Sometime during the night, appellant took the wallet and keys and left the residence with Tremblay's car, a gray Ford Granada; the car contained Tremblay's Universal .30 caliber M–1 carbine. On February 8 appellant abandoned the car in northwestern Arizona, took the rifle and some backpacking equipment, and began walking cross-country. On the evening of February 9 appellant came upon a construction site located approximately 18 miles northwest of Lake Havasu City, Arizona, on state highway 95. Waiting until workmen left for the day, he approached the site and looked for food; he spent the night there in an abandoned camper truck shell. Sometime after appellant settled into the camper shell, Elmer James Clary arrived at the construction site in his International Pickup truck-camper; Mr. Clary likewise spent the night there, in his own camper. Many of the details of the next morning, February 10, are derived from a confession given to police officers by appellant after his arrest.

Shortly after daylight, appellant approached Clary and asked to purchase some food; Clary replied that he had none to sell. Appellant then asked for a ride into any nearby town, and Clary said that he had no room for a passenger. Appellant then offered to trade jewelry for food, and Clary expressed some interest in such a trade. According to appellant's statement, he then returned to a small shack where he had stored his backpack and the rifle, with the intent of retrieving the rifle and "stealing" Clary's truck. Unexpectedly, Clary followed appellant to the shack, and in appellant's words

". . . I didn't know that he was going to do that—and we came back to the shack and I was at my backpack, I pulled the rifle out and there was a short pause and I just let it up and I started shooting and I later learned that I shot him five times."

Clary had been standing just outside the doorway of the shack at the time of the shooting, and appellant pulled him inside the shed from where he had fallen to the ground. After going through Clary's pockets, appellant loaded the backpack and the rifle into Clary's pickup truck and drove into California.

Appellant drove the pickup truck as far as Bakersfield, California and abandoned it

there; he traveled by bus to the San Francisco-Oakland area. He left the San Francisco area on February 18 and began traveling north, again on foot. He was apprehended in Richmond, California during that night, and taken to jail at the Richmond Hall of Justice. Appellant was initially held for a local burglary (which had been the cause of his arrest, but which fact was not disclosed to the jury at trial) and then awaited extradition to Arizona on the instant charge; on February 25, while still in the Richmond City Jail, appellant made a detailed confession to a Richmond City Police detective regarding the shooting of Elmer James Clary.

The body of Elmer James Clary was discovered by a construction worker in the shack on the morning of February 10; officers of the Mohave County Sheriff's Department began arriving at the scene within about 45 minutes, and "roped it off" to preserve any possible physical evidence. Medical testimony subsequently established that the victim had suffered five gunshot wounds, any one of four of which could have been fatal in itself. Ballistics analysis revealed that three "bullets" or "bullet fragments" extracted from the body of the victim had been fired by the Universal rifle recovered from appellant at the time of his arrest; expended "cartridge cases" found around Clary's body at the construction site also matched that rifle. Fingerprint analysis disclosed appellant's prints on several items within the victim's abandoned pickup truck in Bakersfield, and footprints discovered around the construction site on the morning of February 10 were found to match a pair of boots which had been worn by appellant at the time of his arrest. Appellant raises numerous issues in this appeal, none of which challenge the sufficiency of the evidence to support the jury's finding of his guilt.

## THE CONFESSION

Appellant challenges the admissibility of his confession on two grounds, first alleging that the statements were not made in the "unfettered exercise" of his free will and were therefore involuntary, and second, that the trial court erred in failing to make a definite and certain determination of the "voluntariness" of said confession before ruling it admissible.

With regard to appellant's contention that his confession was in fact involuntary, we start with the proposition that in Arizona confessions are prima facie involuntary and the burden is on the State to show that they were freely and voluntarily made, and not the product of physical or psychological coercion. *State v. Bishop*, 118 Ariz. 263, 576 P.2d 122 (Filed March 1, 1978); *State v. Edwards*, 111 Ariz. 357, 529 P.2d 1174 (1975). Thus, the State must show "by a preponderance of the evidence" that the confession was freely and voluntarily made. *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977); *State v. Arredondo*, 111 Ariz. 141, 526 P.2d 163 (1974). The trial court must look to the totality of the circumstances surrounding the giving of the confession, as presented at "voluntariness" hearings, and decide whether the State has met its burden. *State v. Knapp, supra; State v. Toney*, 113 Ariz. 404, 555 P.2d 650 (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); A.R.S. § 13-1599. However, the trial court's determination of admissibility will not be upset on appeal, absent clear and manifest error. *State v. Bishop, supra; State v. Jordan*, 114 Ariz. 452, 561 P.2d 1224 (1976); *State v. Edwards, supra*.

After appellant's burglary arrest on February 18 he was initially placed in a cell in the Richmond, California city jail with two other prisoners. After being arrested on February 19 on the Arizona murder charge, he was transferred to a "holding" or "detention" cell within the same facility and held there alone. On February 25, while residing in this cell, he made the confession which is here alleged to have been involuntary. Appellant complains that jail conditions were such that his physical and psychological states deteriorated, his "free will" was "overborne" and the confession was involuntary. At the "voluntariness" hearing in this cause appellant testified

that his cell was "filthy"; because it was dirty and there were no means to clean it, the shower did not work, but contained spittle and cigarette butts, and the blanket was dirty; that he was unable to take a shower or brush his teeth; that his daily diet consisted of two "TV" dinners, furnished at 6:00 a.m. and at 6:00 p.m.; that he was cold in jail because he did not have enough blankets and was wearing only a disposable paper-cloth suit, which had gotten torn in several places; that he had contracted "crabs" and suffered from asthma, hay fever, a sinus condition, and chest and head colds, which conditions were aggravated because his medication had been confiscated when he was originally incarcerated. Evidence for the State tended to show that appellant never complained to the witnesses about his physical condition, nor did he request medical attention; that when offered a chance to do so, he declined to contact any friends or relatives, but visited only with his parole officer; that prior to his arrest appellant had not taken a shower for three or four days, as he was hiking around; that he was provided an extra blanket and a toothbrush and toothpaste upon request, by a Richmond police officer; that his suit was not torn; that his only complaint had been a single request for more "chow"; and that at the time of the confession he appeared to be generally in good physical condition. We note additionally that appellant had dropped out of school during the ninth grade, and was over 30 years old at the time of the confession. The confession itself was given in a narrative style, which is not only coherent, but comprehensive and detailed.

■ We recognize that in some situations the conditions of incarceration can be so intolerable as to overcome a prisoner's free will and render a confession involuntary. *See Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (19-year old youth of subnormal intelligence subjected to long stretches of interrogation held virtually incommunicado, while physically weakened and in intense pain); *Brooks v. Florida,* 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed.2d 643 (1967) (defendant confined, naked, in tiny cell with two other prisoners; no toilet facilities except a hole in floor in corner of cell; daily diet was 12 ounces of thin soup and 8 ounces of water; saw no one except prison personnel for 14 days and was completely under control and domination of jailers); and *Townsend v. Henderson,* 405 F.2d 324 (6th Cir. 1968) (19-year-old illiterate prisoner had just received head wound; was kept in dark, primitive cell; had no clothing, kept on bread and water diet; not given *"Miranda"* warnings before confession). However, we do not find that the conditions disclosed in the instant case fall within the rationale of the authorities just cited. The "free will" is not "overborne" where there is evidence of nothing more than uncomfortable surroundings and slight health problems. *See State v. Knapp, supra* (extreme headaches); *United States ex rel. Hayward v. Johnson,* 508 F.2d 322 (3rd Cir. 1975), (painful symptoms of "withdrawal" from narcotics use, shortly after confession); and *United States v. Choice,* 392 F.Supp. 460 (E.D.Pa.1975), (gunshot wounds).

■ Appellant next alleges that his confession was involuntary because of delay between the time of arrest and his first appearance before a magistrate, during which period he gave the confession. As noted above, appellant was arrested on the California burglary charge on February 18, and arrested in California on the Arizona murder charge on February 19. The confession was given on February 25, and at the conclusion of extradition proceedings, appellant was presented before an Arizona magistrate on March 3. The record as to the California judicial proceedings in the interim is confusing. Appellant testified that "[t]he first time I appeared before anyone in a courtroom was a judge. That was some twelve days after I was arrested." On the other hand, he also testified that there were "three or four proceedings" and at one or more of them he was "given a public defender" and that

"It's curious in that I made several court appearance [sic], and the charges

against me were discussed, and the fact mentioned that there was an outstanding murder warrant in Arizona, and I don't believe the judge made any specific ruling about whether or not, in my presence, the charges would be dropped. It was merely postponed, delayed, and I never returned to court on it."

There is no indication as to the dates of these various appearances, and appellant stated "I'm not sure what order the hearings were, and which one was the first hearing I appeared before." The facts are further complicated in that appellant was then facing California charges for trespass and burglary, as well as a "hold" for a California parole violation, in addition to the Arizona murder charge. Appellant had indicated that he would "waive extradition" to Arizona if all California charges were dismissed; although the burglary charge was dismissed on the date he was arrested for the Arizona charge, appellant never did "waive extradition", thus contributing to the delay in his appearance before an *Arizona* magistrate. We agree that the "time elapsing between arrest and arraignment of the defendant making the confession" is one factor to be considered by the trial judge in determining the voluntariness of the confession, when said confession is given "after arrest and before arraignment." A.R.S. § 13–1599(B)(1). [Delay in appearance before magistrate, which occurs *after* confession is irrelevant. *See State v. Everett,* 110 Ariz. 429, 520 P.2d 301 (1974); *State v. Sheffield,* 97 Ariz. 61, 396 P.2d 828 (1964)]. However, such a delay is but a *factor to be considered and does not ipso facto render such statements inadmissible,* in the absence of evidence of oppressive police practices or other activity which would make the statements involuntary. *See United States v. Edwards,* 539 F.2d 689 (9th Cir. 1976); *United States v. Halbert,* 436 F.2d 1226 (9th Cir. 1970); *State v. Jordan,* 83 Ariz. 248, 320 P.2d 446 (1958). We find no such evidence in this record. At any rate, it is the function of the trial court to determine factual disputes at hearings to determine voluntariness of confessions; where conflicting inferences can be drawn

from the evidence, a reviewing court must view the evidence in the light most favorable to sustaining the trial court findings. *State v. Brosie,* 24 Ariz.App. 517, 540 P.2d 136 (1975); *see also State v. Cook,* 115 Ariz. 188, 564 P.2d 877 (1977). We find no "clear and manifest" error in the trial court's determination on this point. *State v. Bishop, supra; State v. Cobb,* 115 Ariz. 484, 566 P.2d 285 (1977).

■ We turn now to appellant's contention that his confession was involuntary because a statement was solicited by police officers after he had invoked his right to remain silent, as established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant's confession was taken by Detective Collier of the Richmond, California Police Department on February 25; prior to that date appellant and Detective Collier had several meetings. Collier first contacted appellant on February 19, the day after his arrest, in reference to the burglary charge; appellant was given the *"Miranda"* warnings and chose to make no statement. Later that same day he was arrested on the Arizona murder charge, but apparently Collier attempted no questioning at that time. On February 20, Deputy Scott of the Mohave County Sheriff's Department arrived from Arizona; Scott and Collier admonished appellant of his *"Miranda"* rights and attempted to question him; when appellant indicated a desire to remain silent, he was returned to his cell. Around February 21 Collier attempted to discuss a different California burglary (which occurred in El Serrito), and appellant again chose to remain silent. Between the 21st and the 25th, Collier visited appellant's cell on several occasions, discussing the progress of the Arizona extradition proceedings and California proceedings involving appellant; he brought appellant a few cigarettes and "I left word with him if he needed anything to contact the jailer and the jailer would contact me . . ." On the 25th, appellant asked Collier for a toothbrush and toothpaste; Collier provided these to appellant, and after appellant had brushed his teeth he was returned to his cell. Then according to Collier:

"I advised him if he wished to make a statement, or needed anything to contact the jailer, at which time the defendant stated, 'I will give you the same statement I would give Arizona'. At which time I stated, as I recall, it was about five minutes before quitting time, I stated to him, 'If it's going to be a five-minute thing on how you didn't do it, I don't want to get involved. It's Arizona's thing'.

"He then stated words to the effect that he would give me the same statement he would give Arizona, and I inferred that meant that it was probably going to be a little bit more comprehensive than words of denial, . . . "

After Collier obtained a tape recorder and a witness, appellant was again admonished of his *"Miranda"* rights and subsequently gave the confession in question. Appellant admits receiving the *"Miranda"* warnings and that he is generally "aware" of what they are; he testified that he chose to "talk" to Collier because "Detective Collier was the only one I was really familiar with there in the prison facility, and he was reasonably a likeable guy, very nice person"; and "I assumed that, then, I would be in a position where I could get in a little better position myself if I was cooperative". On these facts, we believe the following language in *United States v. Collins,* 462 F.2d 792 (2nd Cir. 1972) is relevant:

"We do not believe that anything decided in *Miranda* was meant to prohibit police officers from ever asking a defendant to reconsider his refusal to answer questions. So to hold would be tantamount to enacting a 'no questioning' rule once a suspect was in custody. Such a rule finds no support in the Fifth Amendment nor, fairly read in *Miranda* itself, nor in common sense." 462 F.2d at 797.

Accordingly, in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court interpreted its own *Miranda* decision as follows:

"Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

. . . . .

"We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored'." 423 U.S. at 102–104, 96 S.Ct. at 326.

This court has consistently applied the reasoning of *Michigan v. Mosley, supra,* sanctioning only police procedures in which an accused's "right to cut off questioning" is "scrupulously honored". *See State v. Hatton,* 116 Ariz. 142, 568 P.2d 1040 (1977); *State v. Lee,* 114 Ariz. 101, 559 P.2d 657 (1976); *State v. Travis,* 26 Ariz.App. 24, 545 P.2d 986 (1976); *State v. Sauve,* 112 Ariz. 576, 544 P.2d 1091 (1976); *State v. Edwards,* 111 Ariz. 357, 529 P.2d 1174 (1974). We believe that the circumstances surrounding appellant's confession clearly satisfy these requirements. Even further, we note that appellant volunteered to give a statement to Collier; the interrogation was not initiated by the police. It has been held, in *State v. Kroupa,* 16 Ariz.App. 254, 492 P.2d 750 (1972), that:

"Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by the holding in *Miranda.* (Citation omitted) A change of mind on the part of the defendant prompted by his own psychological makeup and not by continued interrogation and efforts to convince the defendant to communicate with the officers is not proscribed by *Miranda."* 492 P.2d at 753.

In summary, we find that appellant's Fifth Amendment rights were not violated by Detective Collier in availing himself of appellant's offer to give "the same statement I would give Arizona". We find no "clear and manifest error" in the trial court's determination that, looking to the "totality of the circumstances", the confession of appel-

lant was voluntary. *State v. Knapp, supra; State v. Bishop, supra.*

Secondly, appellant contends that the trial court erred in failing to make a "definite determination of voluntariness". It is clear that a criminal defendant is entitled to a fair and independent hearing before a trial judge who determines the "voluntariness" of a confession, prior to submission of that confession to the jury which will adjudicate his guilt or innocence; that is so even where the jury is properly instructed that it must disregard such confession if it is determined that it was not given voluntarily. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *State v. Owen,* 96 Ariz. 274, 394 P.2d 206 (1964). *Miranda v. Arizona, supra,* did not displace the standards of "voluntariness" established by case law before that decision; whether a confession is voluntary depends on the facts of each case, and compliance with the *Miranda* decision is only one factor to be considered. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Morales v. Rodriguez,* 373 F.2d 15 (10th Cir. 1967); A.R.S. § 13–1599. At the conclusion of the "voluntariness" hearing in the instant case, and after counsel had been given time to file memoranda, the trial judge made the following minute entry:

> "[T]he Court finds by a preponderance of the evidence that all other statements made by the Defendant were voluntary or made after proper constitutional warning and were therefore lawful in all respects and are admissible in evidence; therefore, Defendant's Motion to Suppress these statements is denied."

Reviewing courts in Arizona have been strict in requiring that the trial court's determination of voluntariness be definite; numerous cases have condemned findings as insufficiently definite. *See State v. Costello,* 97 Ariz. 220, 399 P.2d 119 (1965) (after finding a "prima facie" showing of voluntariness, "I am not the one who determines whether it was voluntary"); *State v. Marovich,* 109 Ariz. 45, 504 P.2d 1268 (1973) ("The defense motion to suppress the statements of the defendant is denied. . . . As I say, it would be basically up to the jury to determine the facts . . . on the basis of the evidence which has been presented."); *State v. Mileham,* 100 Ariz. 402, 415 P.2d 104 (1966) ("The objection is overruled."); *State v. Dodd,* 101 Ariz. 234, 418 P.2d 571 (1966) (The confession is "prima facie voluntary."); *State v. Ramos,* 108 Ariz. 36, 492 P.2d 697 (1972) ("Objection overruled. The court finds that there was an intelligent waiver."); *State v. O'Dell,* 108 Ariz. 53, 492 P.2d 1160 (1972) ("Then I'll admit it."); *State v. Goodyear,* 100 Ariz. 244, 413 P.2d 566 (1966) ("The statements will be allowed in evidence."); *State v. Devaney,* 18 Ariz.App. 98, 500 P.2d 629 (1972) (" . . . the motion will be overruled. The witnesses will be permitted to testify. The court finds, based on this hearing, that they should be permitted to testify before the jury."); and *State v. Knaubert,* 27 Ariz.App. 53, 550 P.2d 1095 (1976) ("I will deny those motions" and "It is Ordered that the motion to suppress statement is denied."). However, we have also recognized that the required "definite determination" of voluntariness refers to the trial judge's mental process, not to the strict interpretation of his words. In *State v. Marovich,* 109 Ariz. 45, 504 P.2d 1268 (1973), we said:

> "[The Attorney General's] argument is that the judge's overruling of the motion to suppress was tantamount to a finding of voluntariness, and that to require the ruling to be a finding of voluntariness in so many words 'is to enshrine form over substance.' *The argument is persuasive where it is clear that the judge understood Jackson v. Denno, supra, and merely worded his ruling badly.* But in the instant case, it is clear that the trial judge did not understand that the duty of finding the admission to be voluntary was his and his alone, since he said, when he ruled, that it was really up to the jury to make that determination." (Emphasis supplied.) 504 P.2d at 1269.

Thus, in *State v. Castoe,* 114 Ariz. 47, 559 P.2d 167 (App.1976), the Court of Appeals reviewed a trial court finding that " . . . the defendant was apprised of

his *Miranda* warnings on several occasions. . . . The Court further finds that any statements made by the defendant were not induced by any promises of any kind." In holding this to be a sufficient finding of voluntariness, the appellate court referred to our language in *Marovich, supra,* and relied on the facts that a voluntariness hearing had been held, the trial court's statements during the hearing indicated that he knew the issue was voluntariness, and his ruling went to the only issue concerning voluntariness, *i.e.,* promises of immunity. Appellant herein alleges that the trial court's finding in the instant case, as quoted above, clearly shows a determination in the alternative, *i.e.,* that the confession was *either* voluntary *or* was obtained after proper *Miranda* warnings, and was therefore indefinite. We note that the court ruled also that the statements were "lawful in all respects." On at least six separate occasions during the hearing, the trial court described it as one to determine "voluntariness"; the court's rulings and questions to witnesses expressed interest in the question of any delay in appellant's arraignment and negotiations over extradition waiver in return for dismissal of California charges. It thus appears that the court was concerned with "voluntariness" beyond the point of any violation of *"Miranda"* rights, and that he was not deferring the decision to the jury for their determination alone. While the ruling is admittedly not a model of clarity, we think it clear that the judge understood *Jackson v. Denno, supra,* and that the finding was sufficient under the circumstances. *State v. Marovich, supra; State v. Castoe, supra.* We note additionally that appellant's trial counsel made no objection to the form of the finding. *See State v. Robinson,* 6 Ariz. App. 419, 433 P.2d 70 (1967).

## DOES A.R.S. § 13–454(E)(1) DENY EQUAL PROTECTION OF THE LAW?

Even though there is a question as to whether there is a proper equal protection issue here, we proceed to discuss the issue as treated by the parties to the appeal. One aggravating circumstance which is to be considered by the sentencing judge in determining whether to assess the death penalty is:

"1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." A.R.S. § 13–454(E)(1).

Appellant does not dispute the trial court's finding that he had been previously convicted of such an offense, as noted above. Rather he argues that the classification thus created (distinguishing between those who have been previously convicted of such an offense and those who have been convicted of some other offense, arguably equally or more serious) is not necessary to promote any "compelling state interest" and is therefore violative of the constitutional guarantees of equal protection of the laws. He points to offenses such as assault with caustic chemicals, which carries a potential punishment of one to fourteen years imprisonment (A.R.S. § 13–251) and offering to sell marijuana, which carries a potential punishment of five years to life imprisonment (A.R.S. § 36–1002.07). Assuming then that two persons were convicted of the identical act of first degree murder and no mitigating circumstances were shown, the person with the prior conviction for offering to sell marijuana would be sentenced to death, while the defendant with a prior conviction for assault with caustic chemicals (assertedly a more "hideous and gruesome" crime) could not be sentenced to death. Appellant urges that the marijuana salesman is thus denied equal protection of the laws. While entertaining serious doubts as to appellant's standing to raise this issue in view of the nature of his previous conviction, we proceed to examine the merits of his position. Initially we note that specification of punishment for crime is peculiarly a question of legislative policy. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *State v. Leuck,* 107 Ariz. 49, 481 P.2d 842 (1971). The death

penalty is not the type of punishment which may never be imposed, and the character of the individual offender is one circumstance which should be considered. The sentencing authority should be given guidance about the defendant (as well as the crime) which the state, representing organized society, deems particularly relevant to the sentencing decision. *Gregg v. Georgia, supra; Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). There is a presumption that the legislature acts constitutionally and when there is a reasonable, even though debatable, basis for the enactment of a statute, reviewing courts will uphold the act unless it is clearly unconstitutional. *State v. Murphy,* 117 Ariz. 57, 570 P.2d 1070 (1977). Thus, the burden rests on one challenging the validity of a statute to establish that it infringes upon some constitutional guarantee or violates some constitutional principle. *State v. Yabe,* 114 Ariz. 89, 559 P.2d 209 (App.1977). The statute in question has a "legitimate" purpose, namely, providing information about the defendant, which the legislature deems relevant to punishment for first degree murder, to the sentencing judge. *Gregg v. Georgia, supra; Proffitt v. Florida, supra.* The classification created (those defendants previously convicted of a crime punishable by death or life imprisonment under Arizona law) promotes the goal of the statute, in that it has a rational relation to the statutory purpose. *See State v. Cassius,* 110 Ariz. 485, 520 P.2d 1109 (1974); *State v. Harmon,* 25 Ariz.App. 137, 541 P.2d 600 (1975); *State v. Norcross,* 26 Ariz.App. 115, 546 P.2d 840 (1976). As we said in *State v. Kelly,* 111 Ariz. 181, 526 P.2d 720 (1974):

"The Fourteenth Amendment does not deny a state the power to treat different classes of persons in different ways as long as the classification is reasonable. (Citations omitted.) And the Fourteenth Amendment does not deny a state the power to classify in the adoption of police law, (citations omitted), and a legislative classification will not normally be set aside if any set of facts rationally justifying it is demonstrated to or perceived by the courts. (Citation omitted.)" 526 P.2d at 723.

*See also State v. Maloney,* 105 Ariz. 348, 464 P.2d 793 (1970):

"It is settled law that any *one* penalty does not abridge the rights of a person under the Equal Protection Clause so long as no *one* person is subject to any different or greater punishment than others of the same class. (Citation omitted.) Equal protection of the laws here means only that the death penalty may be applied to all persons in the State in a like position. And, in Arizona, all persons charged with murder in the first degree face possible imposition of the extreme penalty. Equality of treatment does not destroy individualization of sentencing to fit the crime and the individual. Persons convicted of the same crime can constitutionally be given different sentences. (Citation omitted.)" 464 P.2d at 799.

We find that the classification created by A.R.S. § 13–454(E)(1) has a rational relation to the furtherance of a legitimate state purpose and therefore does not deny equal protection of the laws.

### RELIANCE BY THE STATE UPON A THEORY OF "LYING IN WAIT" TO SUPPORT THE CHARGE OF FIRST DEGREE MURDER

The State relied on three theories, in the conjunctive and in the alternative, to support the charge of first degree murder herein, namely, that it was committed by lying in wait, by premeditation, and/or in the perpetration of robbery. *See* A.R.S. § 13–452. Appellant contends that "reliance by the prosecution upon a 'lying in wait' theory of first degree murder was prejudicial and reversible error because such a theory was not supported by the evidence and because the jury was never instructed as to the elements of lying in wait." First, with regard to the sufficiency of the evidence to sustain such a theory, we note the following uncontradicted facts from the trial transcript. The shack in which the victim's body was found was closed on the front (west) side, in that all doors and windows were securely covered;

the only opening was the rear (east) entrance. Tracks identified as the victim's led from near the highway, in an easterly direction toward the shack, along the north side of the shack, and thence to the northeast corner near the back door. No tracks identified as those of appellant accompanied these tracks of the victim; rather, appellant's tracks were found along the south and east (back) side of the shack, on the opposite side from those of the victim. Blood spatters, shell casings ejected from the murder weapon, and fragments from the watch worn by the victim were all found on the ground just outside the rear door. From the location of entrance and exit wounds to the victim and the path of the bullets through the body, it is logical to infer that the weapon was fired at the victim from an elevated position (the floor inside the shack was elevated slightly above the ground) and that the victim had thrown up his arms in surprise. Appellant's statement indicated that he searched the victim's pockets for his truck keys, after dragging the victim inside the shack. We held in *State v. Brooks,* 103 Ariz. 472, 445 P.2d 831 (1968) that

" 'The elements necessary to constitute lying in wait are watching, waiting, and concealment from the person killed with the intention of inflicting bodily injury upon such person or of killing such person.' " 445 P.2d at 832.

In *State v. McIntyre,* 106 Ariz. 439, 477 P.2d 529 (1970), we set forth the test for determining whether evidence in a particular case is sufficient to warrant the giving of a particular jury instruction, as follows:

"[I]f the evidence presented in a case is sufficient to support some theory by which the jury might have reasonably found the defendant guilty of the offense which was the subject of an instruction, then the instruction was properly given. (Citation omitted.)" 477 P.2d at 535.

From the evidence previously noted, the jury could have disregarded appellant's story that he approached the victim at the victim's truck, that they had certain discussions there, that they left the victim's truck running and proceeded back to the shack together. We believe that the jury "might have reasonably found" rather that appellant was watching and waiting for the victim from behind or inside the shack as the victim approached, and that he shot from inside the shack as the victim reached the back door; after dragging the victim inside, he then searched for the truck keys as he did not know that the truck was running. The trial court did not err in giving a "lying in wait" instruction to the jury, on this evidence. *State v. McIntyre, supra.*

The trial court instructed the jury with R.A.J.I.C. 4, as to the definition of murder and the distinction between first and second degree murder, but did not attempt to define, or set forth the elements of, "lying in wait". Without deciding whether the court was required to further define a term such as "lying in wait", we note that appellant made no request for such an instruction, nor was there an objection when the State argued this theory during summation to the jury. 17 A.R.S. Rules of Criminal Procedure, rule 21.3(c) states:

"Waiver of Error. No party may assign as error on appeal the court's giving or failing to give any instruction or portion thereof or to the submission or the failure to submit a form of verdict unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

As we said in *State v. Toney,* 113 Ariz. 404, 555 P.2d 650 (1976), "[f]ailure to specifically state the grounds for objections to instructions, or the failure to give them, waives the right on appeal." 555 P.2d at 654. Unless a matter is vital to the rights of a defendant (fundamental error), failure to give an instruction which has not been requested is not error. *State v. Hardy,* 112 Ariz. 205, 540 P.2d 677 (1975); *State v. Evans,* 109 Ariz. 491, 512 P.2d 1225 (1973). Here the jury was also instructed on the State's theories of premeditation and robbery; while premeditation is usually debatable in any first degree murder case, we feel the evidence that this murder was committed during the perpetration of a robbery

is overwhelming. Thus, assuming that a further instruction on "lying in wait" was warranted, we find no "fundamental error" in the failure to give it without request by the defense.

## THE TRIAL COURT'S EXCUSAL, ON ITS OWN MOTION, OF PROSPECTIVE JURORS

Appellant next alleges that "the excusal of three jurors on the grounds of very slight inconvenience constituted a violation of A.R.S. § 21–202(2), Art. 2, § 23 of the Arizona Constitution and the Sixth Amendment of the United States Constitution and deprived appellant Arnett of a jury of his peers." During the voir dire portion of the trial the court informed the prospective jurors that the trial was expected to take five days, and inquired whether jury service for that length of time would be "special or undue hardship" on any of them. One venireman stated that he was the owner of a radio station and that "[d]ue to the length of the trial" jury service would be "a hardship on business"; another stated that service "would kind of hurt my paycheck a little bit, too"; and a third responded "[i]n my job I have to be there this week. I was on vacation last week and it's a pretty tough schedule this week and five days would end my paycheck." Thereafter, the court on its own motion excused the three for "personal" and "business" reasons. There was no objection to this excusal from either the State or the defense. At the conclusion of the voir dire procedure the following colloquy occurred between the court and defense counsel:

"The Court: Pass the panel, Mr. Bair?

"Mr. Bair: Yes, I do."

Initially, we feel that appellant's reliance on A.R.S. § 21–202(2) is misplaced, in that the statute deals with the selection of a panel for jury service generally, rather than with the voir dire procedure for a particular trial.

 A defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case, but he is not entitled to be tried by any particular jury; therefore, unless the record affirmatively shows that such a fair and impartial jury was not secured, the conviction must be affirmed. *State v. Zimmer*, 106 Ariz. 166, 472 P.2d 35 (1970). Our review of the record has disclosed no evidence that the jury which heard this case was not fair and impartial, nor has appellant directed us to any such evidence. Ordinarily, the matter of excusing jurors is committed to the sound discretion of the trial judge, and in the absence of a clear and prejudicial abuse of that discretion, his action will not be disturbed on appeal; this is so even where the judge acts on his own motion. *See State v. Waddell*, 289 N.C. 19, 220 S.E.2d 293 (1975); *Glenn v. State*, 154 Ind.App. 474, 290 N.E.2d 103 (1972); *State v. Rogers*, 263 S.C. 373, 210 S.E.2d 604 (1974); *Dragovich v. Slosson et al.*, 110 Cal.App.2d 370, 242 P.2d 945 (1952). Further, it is generally not improper to exclude some persons from a jury when the reason for their exclusion is economic hardship which jury service would entail. *See People v. Milan*, 9 Cal.3d 185, 107 Cal.Rptr. 68, 507 P.2d 956 (1973); *Williams v. State*, 51 Ala.App. 1, 282 So.2d 349 (1973), *cert. denied*, 291 Ala. 803, 282 So.2d 355 (1973); *Commonwealth v. Beneficial Finance Co. et al.*, 360 Mass. 188, 275 N.E.2d 33 (1971); *State v. Fulghum*, 242 La. 767, 138 So.2d 569 (1962). We believe that these decisions from other jurisdictions support our position that the trial judge in the instant case did not err in the exercise of his judgment that the three prospective jurors should be excused to prevent undue hardship. We further note that appellant waived any objection in this regard, both by failing to object at the time of the excusal (*see State v. Lee*, 114 Ariz. 101, 559 P.2d 657 (1976); *Midkiff v. State*, 43 Ariz. 323, 30 P.2d 1057 (1934), and by expressly approving the panel at the conclusion of voir dire (*see Glover v. State*, 273 Md. 448, 330 A.2d 201 (1975); *People v. Cobb*, 19 Ill.App.3d 520, 311 N.E.2d 702 (1974)).

## WAS APPELLANT PREVIOUSLY CONVICTED OF A CRIME OF "VIOLENCE"?

Appellant's final contention is that "in enacting A.R.S. § 13–454(E)(2) dealing with

crimes of 'violence', the Arizona Legislature did not intend to include within the purview of the phrase 'violence' the type of crime appellant Arnett had previously been convicted of, thus, the imposition of the death sentence pursuant to that aggravating circumstance was improper." Evidence disclosed that appellant's prior crime of "violence" was a "lewd and lascivious" act upon "a child under the age of 14 years"; appellant admitted that he had inserted his finger into the vagina of a five-year-old girl, which ruptured her hymen and caused vaginal bleeding.

 In interpreting statutes, this court is guided by the legislative mandates of Title 1, Chapter 2, Article 2 of the Arizona Revised Statutes. A.R.S. § 1–211 provides as follows:

"§ 1–211. Rules of construction and definitions

. . . . .

"C. The rule of the common law that penal statutes shall be strictly construed has no application to these revised statutes. Penal statutes shall be construed according to the fair import of their terms, with a view to effect their object and to promote justice."

A.R.S. § 1–213 requires that "[w]ords and phrases shall be construed according to the common and approved use of the language". Thus, in determining the intent of the legislature, words of the statute are to be given their ordinary meaning unless it appears from context or otherwise that a different meaning should control. *State v. Raffaele*, 113 Ariz. 259, 550 P.2d 1060 (1976). And in construing a statute, if the language is plain, there is no occasion for construction or interpretation. *Continental Casualty Company v. Industrial Commission*, 113 Ariz. 116, 547 P.2d 470 (1976). Guided by these principles, we quote the definition of "violence", from Webster's Third New International Dictionary (1976 Unabridged), as the "exertion of any physical force so as to injure or abuse." We believe that appellant's prior conduct clearly fits within this "common and approved use" of the term "violence". A.R.S. § 1–

213; *Landry v. Daley*, 280 F.Supp. 938 (N.E.Ill.1968); *People v. Brown*, 262 Cal. App.2d 378, 68 Cal.Rptr. 657 (1968). The trial court was correct in finding an aggravating circumstance as set forth in A.R.S. § 13–454(E)(2).

In addition to the points presented by appellant, we have reviewed the record pursuant to A.R.S. § 13–1715 and find no fundamental error. The judgment and the sentence of the trial court are affirmed.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.