911 P.2d 562

**STATE of Arizona, Appellee,**

v.

**Daniel LUJAN, Appellant.**

**Nos. 1 CA–CR 94–0168, 1 CA–CR 94–0169.**

Court of Appeals of Arizona,
Division 1, Department E.

Aug. 24, 1995.

Review Denied Feb. 21, 1996.*

* Corcoran, J., of the Supreme Court, did not participate in the determination of this matter.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and J. Randall Jue, Assistant Attorney General, Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by James H. Kemper, Deputy Public Defender, Phoenix, for appellant.

## OPINION

GARBARINO, Judge.

Daniel Lujan (defendant) appeals the trial court's revocation of his probation and imposition of a four-year sentence on one count of attempted second-degree burglary. He also appeals his conviction and seventeen-year sentence on one count of kidnapping, contending that the trial court abused its discretion by refusing to strike the jury panel and that his sentence constitutes cruel and unusual punishment under the United States and Arizona Constitutions. We affirm.

### FACTS AND PROCEDURAL HISTORY

At age sixteen, defendant was transferred to superior court for prosecution as an adult and charged by indictment with second-degree burglary, a class 3 felony. Eventually, he pled guilty to attempted second-degree burglary, a class 4 felony, and was placed on probation for four years.

On Halloween night of 1992, approximately six weeks after defendant was placed on probation, he was involved in another incident. Robert, the thirteen-year-old victim, was riding on the handlebars of his friend's bike when defendant and another person yelled at them, causing Robert's friend to stop the bike. Robert jumped off the handlebars, and defendant grabbed Robert from behind in a "bear hug" and dragged him against his will to a nearby house. The house belonged to Ernestine Guillen, and apparently a party was taking place. After defendant knocked on the door, Julio Carmelo opened it and told defendant to bring Robert inside. Carmelo, who was Ernestine's fiance and knew Robert prior to this incident, then called Ernestine's younger brother, Boxer, into the house.

Once inside the house, defendant released Robert. Despite the presence of other persons, including small children, defendant and two or three others proceeded to surround Robert. Defendant said, "What should we do? Stab him? Shoot him? Jump him or

whatever.... I don't mind. I already stabbed four or five others." Robert's mouth was shaking, and he was quivering and had tears in his eyes. Robert's testimony revealed that he feared for his life. According to Carmelo, defendant and another person wanted to take Robert into the backyard and beat him up for a Halloween prank. However, Boxer told Robert to leave, and he left. The incident spanned approximately five minutes.

Following this incident, the seventeen-year-old defendant was again transferred to superior court for prosecution as an adult and charged with kidnapping, a class 2 felony. Because the victim was under fifteen years of age, the offense was alleged to be a dangerous crime against children. *See* Ariz. Rev.Stat.Ann. (A.R.S.) § 13–604.01. The State also filed an allegation pursuant to A.R.S. section 13–604.02(B) that the offense was committed while defendant was on probation in the attempted second-degree burglary matter. Additionally, a petition to revoke defendant's probation was filed.

Defendant was found guilty of kidnapping following a jury trial. He was sentenced to the mandatory, presumptive seventeen-year term of imprisonment and credited with 467 days of presentence incarceration. The trial court also revoked defendant's probation on the attempted second-degree burglary conviction and sentenced him to a presumptive four-year term. The court ordered that the sentence for the kidnapping conviction be served consecutively to the sentence for the attempted second-degree burglary conviction. Timely notices of appeal were filed in each cause number.

## DISCUSSION

At defendant's request, we have consolidated the cause numbers. We will address each separately.

### I.  *REVOCATION OF PROBATION*

Defense counsel filed a brief in accordance with *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969), requesting that this Court search the record

for fundamental error pursuant to A.R.S. section 13–4035 and *State v. Powell*, 5 Ariz. App. 51, 423 P.2d 127 (1967). We have given defendant an opportunity to file a supplemental brief *in propria persona* raising any points that he might choose to bring to this Court's attention; however, a supplemental brief has not been filed.

As stated above, defendant was placed on probation for four years after pleading guilty to attempted second-degree burglary. The record indicates that he entered a plea of no contest to a charge of aggravated assault, which resulted in a violation of his probation. The dispositional hearing was conducted simultaneously with the sentencing hearing on the kidnapping conviction. After personally addressing defendant and giving him an opportunity to speak, the trial court found reinstatement of probation inappropriate and sentenced him to a presumptive four-year term of imprisonment. The sentence was run concurrently with the sentence imposed on the aggravated assault conviction, and defendant was given credit for 632 days of presentence incarceration.

Pursuant to A.R.S. section 13–4035, we have read and considered defense counsel's brief and reviewed the record for fundamental error. We find none.

## II. *KIDNAPPING*

### A. *Refusal to Strike the Jury Panel*

█ Defendant first contends that the trial court abused its discretion by refusing to strike the entire jury panel following a panel member's comments regarding his work with gangs and about defendant's appearance. We disagree.

During voir dire, a prospective juror, A.G., said that he was a federal law enforcement officer and that he knew several investigators in the Maricopa County Attorney's Office. The trial court later asked whether any member of the jury panel had been called to testify as a witness at trial. The following colloquy transpired:

JUROR [A.G.]: [A.G.] I've had to testify several times in federal court on cases that I have brought before federal court.

THE COURT: In connection with your—

JUROR [A.G.]: With my job, yes. Now that we're on the subject, I feel that I would be very—what would you call it, prejudicial in the way of my thoughts on this type of case also.

THE COURT: Do you feel that because you're employed in law enforcement that you also have a bias that would favor the testimony of these law enforcement officers who you have not met, that you would automatically tend to be biased in their favor?

JUROR [A.G.]: Yes.

THE COURT: Do you feel that you would not be able to judge their accuracy and credibility by the same standards you'll be asked to apply to the nonlaw enforcement officers?

JUROR [A.G.]: Not necessarily that, but just right now I'm assigned to the Violent Gang Task Force where I work. We deal a lot with juveniles or young people, and I've seen a lot of violence that goes on in these age groups and right now, I don't think I could be very—I'd be biased in a case where I think somebody of Mr. Lujan's age—

THE COURT: So you're concerned with the ages of the people that are involved?

JUROR [A.G.]: Not only the ages, but I work with gangs a lot, and I already have a preconceived notion of Mr. Lujan by his method of dress, his hair.

The trial court promptly excused A.G.

At the close of voir dire, the trial court asked defense counsel whether she had any additional questions. Defense counsel answered affirmatively and stated:

A couple of the people that were on the panel were excused because they had experience as law enforcement officers. And their answers to the judge's questions made it pretty clear they had certain biases, and I'm just concerned that having heard that, if any of you share the biases that I think came across from these officers' answers.

Is there anyone here who thinks that based on what those officers said, it in any way would affect your decisions here?

None of the jurors indicated that the officers' remarks would affect them. Defense counsel later made a motion to strike the entire panel based on A.G.'s comments regarding gangs; however, the motion was denied.

■ Although a defendant is entitled to be tried by a fair and impartial jury, he is not entitled to any one particular jury. *State v. Greenawalt,* 128 Ariz. 150, 167, 624 P.2d 828, 845, *cert. denied,* 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). The trial court must be affirmed "unless the record affirmatively shows that such a fair and impartial jury was not secured." *State v. Arnett,* 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978). Excusing jurors is within the sound discretion of the trial court, and its actions will not be disturbed absent "a clear and prejudicial abuse of that discretion." *Id.*

Our review of the record reveals that the jury was fair and impartial. Defense counsel specifically asked the panel whether the prior remarks would affect their decisions in the case, and no one responded. We therefore decline "to indulge in an assumption ... that the panel was tainted." *See State v. Davis,* 137 Ariz. 551, 558, 672 P.2d 480, 487 (App. 1983). Defendant has failed to meet his burden of showing that the panel was prejudiced by A.G.'s remarks. *See id.* Accordingly, the trial court did not abuse its discretion by refusing to strike the entire panel.

B. *Cruel and Unusual Punishment Under the United States Constitution*

Defendant next argues that his seventeen-year sentence is disproportionate to his crime and therefore constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. He relies on our supreme court's opinion in *State v. Bartlett,* 171 Ariz. 302, 830 P.2d 823, *cert. denied,* 506 U.S. 992, 113 S.Ct. 511, 121 L.Ed.2d 445 (1992) (*Bartlett II* ).

■ We first note the statutes applicable to defendant's sentence. A.R.S. section 13–1304(B) provides that kidnapping is a class 2 felony punishable pursuant to A.R.S. section 13–604.01 if the victim is under fifteen years of age. A.R.S. section 13–604.01(B) states in relevant part that "a person who is at least eighteen years of age or who has been tried as an adult and who stands convicted of a dangerous crime against children in the first degree involving ... kidnapping shall be sentenced to a presumptive term of imprisonment for seventeen years." In addition, A.R.S. section 13–604.02(B) requires defendant to serve the entire presumptive term (flat time) because he was on probation at the time of the kidnapping offense. The trial court had no discretion to sentence defendant to a term less severe than a presumptive term of seventeen years flat.

Prior to sentencing, defense counsel filed a motion requesting that the trial court dismiss the allegation of A.R.S. section 13–604.01 and designate the kidnapping offense as either a class 2 or class 4 felony. Counsel argued that defendant is not among the class of offenders to whom A.R.S. section 13–604.01 is intended to apply and that application of the statute in this case violates defendant's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution. The motion was denied.

■ With this background in mind, we now turn to the question of whether the seventeen-year flat sentence exceeds constitutional limitations. The Arizona Supreme Court has applied the standard set forth in Justice Kennedy's concurring opinion in *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), to determine whether a sentence constitutes cruel and unusual punishment. *Bartlett II,* 171 Ariz. at 305, 830 P.2d at 826. According to our supreme court, "[t]he important test ... is whether the sentence is grossly disproportionate to the gravity of the offense." *Id.* at 304, 830 P.2d at 825. A comparative analysis of defendant's sentence with others in Arizona and across the nation is " 'appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' " *See id.* (quoting *Harmelin,* 501 U.S. at 1005, 111 S.Ct. at 2707). "[I]n weighing the gravity of an offense against the severity of a penalty," consideration should be given to " 'the harm caused or threatened to the victim or society,

and the culpability of the offender.... For example, as the criminal laws make clear, nonviolent crimes are less serious than crimes marked by violence or the threat of violence.'" *Id.* at 306, 830 P.2d at 827 (quoting *Solem v. Helm,* 463 U.S. 277, 292–93, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983)).

At sentencing, the trial court engaged in the analysis articulated in *Bartlett II* and concluded:

> [O]n October 31, 1992, the date of this offense, the defendant was 17 years, one month old. He had already been convicted as an adult of attempted burglary. That offense was committed on October 2, 1991, when he was 16.
>
> This present offense, the kidnapping, was committed just one month or just a little more than a month after the defendant was placed on adult supervised probation and released from custody on that attempted burglary conviction.
>
> On October 31, 1992, the victim was a 13–year old boy, 5 feet 2 inches tall, weighing 103 pounds. He was dragged off his bicycle by the defendant and into the home of [Ernestine] Guillen.
>
> At that time the defendant was five feet 11 inches tall, approximately 145 pounds. The victim in this case—this Court has seen the victim. He appeared to be a young boy. He did not appear to be older than his age. He certainly appeared to be a 13–year old boy. There could not be any mistake that he was much younger than the defendant.
>
> The defendant threatened the victim with physical harm. The evidence at the trial was that the defendant threatened to stab him, jump him or kill him. The victim suffered emotional harm in this case.
>
> Witnesses in this case stated that the defendant's expressed intention was to take the victim into the backyard so that he ... could beat him up.
>
> The victim was admittedly scared, according to the testimony of witnesses, at the time and it appears to the Court that the only reason that the defendant allowed the victim to leave was due to the intervention of third persons.
>
> Under all of these circumstances, including the defendant's prior felony record as an adult, the fact that he was on probation for six weeks at the time of this offense, the emotional harm to the victim, the threatened physical harm to the victim, the Court finds the defendant is fully culpable as an adult for this offense.
>
> He knew the victim was a child, and he knew that he was already an adult felon at the time that he committed this offense.
>
> Under these circumstances, and the Court applying the standard set forth in *Bartlett* to attempt to determine whether this is a rare case where the mandatory sentence is grossly disproportionate to the severity of the crime, the Court cannot say that it is.

■ Having conducted our own review of the case and the relevant factors, we agree with the trial court that a sentence of seventeen years does not raise an inference of gross disproportionality. As did the trial court, we have considered the violent conduct proposed by defendant, including Carmelo's testimony that defendant wanted to take the victim into the backyard to beat him. The dissent speculates that defendant did not really intend to shoot or stab the victim "because the threat was made in the presence of people who were not sympathetic to it" and that "there is a good chance that [the beating] would not have been severe." We will not join in this conjecture. It is just as likely that defendant actually intended to inflict serious bodily harm upon Robert and that such harm would have resulted had third parties not intervened. The record clearly supports the conclusion that this crime involved a threat of violence. Moreover, as the trial court observed, defendant had a prior adult felony record and had been placed on probation just weeks before he committed the kidnapping. These facts enhance the gravity of the present offense. *Cf. Bartlett II,* 171 Ariz. at 307, 830 P.2d at 828 (finding that the defendant's lack of a prior record reduced the gravity of his offenses). In addition, despite defendant's age, we cannot disagree with the trial court's finding that he was fully culpable as an adult given his prior felony record and the evidence that he in-

tended to harm the child victim. Consequently, we do not find that the imposition of a seventeen-year flat term raises an inference of gross disproportionality, and we therefore need not reach the intra- and inter-jurisdictional analyses performed by the dissent.

■ The Arizona legislature has enacted laws that impose severe consequences upon persons who commit crimes against children. Our supreme court has "acknowledge[d] the legislature's prerogative to criminalize behavior and to choose the appropriate punishment." *Bartlett II,* 171 Ariz. at 308, 830 P.2d at 829; *see also Harmelin,* 501 U.S. at 998–99, 111 S.Ct. at 2703. It can only be assumed that the legislature intended to remove the people who would commit such crimes from the streets in order to protect children.

The dissent cites *Bartlett II* and disregards *Harmelin,* moving directly to a discussion centered on the victim, defendant, and facts of the case, conveniently avoiding the threshold comparison of the crime committed and the sentence imposed. The dissent speaks of the insincerity of the victim when describing his fright and his tolerance for the conduct to which he was subjected. It further postulates that defendant was merely committing a "prank" and that "it seems very unlikely" that defendant ever intended to carry through with his threats. To a limited extent we have engaged in the analysis proposed by the dissent; however, this is not the analysis Justice Kennedy employed in *Harmelin.* In *Harmelin,* Justice Kennedy focused on the threat posed to the individual and society by commission of the crime and not on the particular facts and circumstances of the crime. 501 U.S. at 1002–05, 111 S.Ct. at 2705–07. Because our analysis leads us to conclude that this is not "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality," we must decline the dissent's invitation to extend our analysis to an intra- and inter-jurisdictional proportionality review. *See id.* at 1005, 111 S.Ct. at 2707.

## C. *Cruel and Unusual Punishment Under the Arizona Constitution*

■ Defendant's final contention is that his sentence violates the ban against cruel and unusual punishment embodied in article 2, section 15 of the Arizona Constitution. He concedes that there is no authority to support his claim that the state constitutional provision should be applied differently than the Eighth Amendment to the United States Constitution. In the absence of such authority, we decline to hold that his sentence violates the Arizona Constitution.

## CONCLUSION

Pursuant to A.R.S. section 13–4035, we have reviewed the entire record for fundamental error. We find none. The revocation of probation and sentence imposed on defendant's conviction for attempted second-degree burglary are affirmed. Upon the filing of this decision, counsel shall inform defendant of the status of his appeal and of his future options. Defense counsel has no further obligation unless, upon review, he finds an issue appropriate for submission to the Arizona Supreme Court by petition for review. *See State v. Shattuck,* 140 Ariz. 582, 584–85, 684 P.2d 154, 156–57 (1984). Defendant shall have thirty days from the date of this decision to proceed, if he desires, with a *pro per* motion for reconsideration or petition for review. We also affirm defendant's conviction and sentence on the kidnapping charge.

WEISBERG, J., concurs.

KLEINSCHMIDT, Presiding Judge, dissenting:

Simplified, what happened in this case is this. The seventeen-year-old Defendant, a boy with a bad record and a potential for violence, received a sentence of seventeen years flat for grabbing a thirteen-year-old boy, taking him a short distance into a house, threatening to harm him, and then immediately releasing him unharmed when others told the Defendant to do so. I think the sentence imposed in this case is so disproportionate to the crime that it offends the Eighth Amendment ban against cruel and

unusual punishment. The case merits a close look at the Defendant's background and character, at the facts of the offense, and at how other crimes are punished, both in this state and other states.

At the time the offense occurred, the Defendant, Daniel Lujan, was one month past his seventeenth birthday. He lived with his mother, who raised him without help from the time his father had left the family some eight or nine years before. Lujan, who has a low IQ and reads at the fifth grade level, had completed the tenth grade and later dropped out of technical school when he lost interest in his course in welding. He had been expelled from school on several occasions because of problems with teachers.

Lujan's troubles with the law began at nine years of age when he was arrested for shoplifting. Over the years, he was brought before the juvenile court for trespassing and causing damage to property, for petty theft and for a curfew violation. In 1989, he admitted to a burglary and a theft and he was placed in the custody of the Department of Youth Treatment and Rehabilitation. He was released, and in 1991, he was again charged with burglary. No property was taken in this latter burglary but about $75 worth of damage was done to a window and a screen. Lujan was transferred for prosecution as an adult, pled guilty and received probation.

According to a presentence report prepared at the time of this first adult conviction, the prosecutor feared that the Defendant was a person who could explode at any time. A Glendale police officer described the Defendant as being very "anti-police," and the Defendant's juvenile probation officer described him as a rude person who was "sneaky and weird." A psychologist who performed a mental health examination on Lujan reported that the Defendant admitted being a member of the Varrio Sixty–First Street Gang and participating in drive-by shootings. The Defendant told him that he had shot a person. The psychologist quoted the Defendant as saying, "They tell me to do things, and I do it. Tell me to kill someone, I go do it." The Defendant also told the psychologist that he only stole from people who could afford it. The examiner concluded that Lujan was a "very dangerous young man who is extremely impulsive and unpredictable."

In September 1992, Lujan was placed on probation on the condition, among others, that he have no contact with any known gang member. A month later he committed the acts that led to his conviction for kidnapping.

The facts of the kidnapping are as follows. The thirteen-year-old victim was riding on the handlebars of a friend's bicycle on the street where he, the victim, lived. Police reports indicate that according to witnesses, the victim was dressed in gang attire and was flashing West Side Gang signs. Despite the victim's denials, the police suspected that he belonged to a gang. For whatever reason, the Defendant, who either did belong or wanted to belong to a rival gang, accosted the victim, grabbed him in a bear hug and dragged him to a nearby house where a Halloween party was in progress.

The man who lived in the house, Julio Carmelo, opened the door and told the Defendant to come inside. As it happened, the victim and Carmelo were acquainted. Once inside, the Defendant released the victim, but the victim was surrounded by three or four people. There were other people in the room, including some children. The Defendant asked for his friend, Robert. Robert was in the backyard and Carmelo told someone to get him. At this point, according to the victim, the Defendant said, "What should we do? Stab him? Jump him? Shoot him? I don't mind. I already stabbed four or five others." As Carmelo remembered it, the Defendant wanted to take the victim to the backyard and beat him up as a Halloween prank. The victim was afraid, and his mouth trembled and there were tears in his eyes.

Carmelo told Robert to tell the Defendant to let the boy go, and when Robert came into the room he did tell the Defendant to release the victim. The Defendant acceded, and the victim went home. In all, the victim was restrained against his will for about five minutes.

Right after the Defendant grabbed the victim, the victim's friend went to the victim's

home and told the victim's mother what had happened. She had called the police. The friend was present when the victim returned home and he, the friend, described the victim as a little shaken up. He conceded on cross-examination that he had told the defense lawyer that when the victim returned home he was his "usual self." A policeman who talked to the victim when he returned home said that the victim acted more upset when his mother was present than when she was not.

The police investigated, and Lujan was eventually arrested. He was transferred for prosecution as an adult for kidnapping, a dangerous crime against children in the first degree committed while on probation, in violation of A.R.S. sections 13–1304, 13–1301, 13–604.01, 13–702, 13–801 and 13–812 (1989).

Before Lujan was transferred for prosecution as an adult, he was examined by the same psychologist who had seen him earlier. The psychologist noted that Lujan continued to identify with the Varrio Sixty–First Street Gang and that he was somewhat cocky, manipulative and defiant. When asked if he was going to talk to the psychologist, he said, "That depends, it depends on what kind of stupid question you ask. You ask a stupid question, then I'll give you a stupid answer. It makes no difference whether I talk to you or not. They're gonna transfer me. This is total bullshit. I didn't do anything. They're fucking with me." During the interview, Lujan said spontaneously, "Next time, I'll give them something to really press charges on, instead of this pussy shit." The psychologist concluded that Lujan was impulsive, angry and unpredictable and that he was more angry and aggressive than when the psychologist had last seen him. The report noted that the Defendant had a potential for violence, that he had been involved in altercations since he was incarcerated, and that he had strong anti-social characteristics that were not likely to change within a short period of time. The psychologist noted that Lujan needed long-term therapeutic intervention.

Lujan was convicted as charged following a trial by jury. He filed a "Motion to Dismiss Allegation of 13–604.01 and to Designate Offense a Class 4 Felony, or in the Alternative, a Class 2 Felony." The statute he sought to avoid, A.R.S. section 13–604.01, prescribes the penalty for dangerous crimes against children. The gist of the motion was that the mandatory sentence of seventeen years without possibility of release on any basis before the full sentence was served constituted cruel and unusual punishment.

The trial judge considered the motion. She found that the Defendant was much larger and older than the victim, that he had threatened the victim with physical harm, that the victim suffered emotional harm, that witnesses said the Defendant intended to take the victim to the back yard and beat him up and that only the intervention of third persons caused the Defendant to allow the victim to leave. Based on the Defendant's prior record, his knowledge that the victim was a child, the threatened physical harm and the emotional harm to the victim, the trial judge found that the sentence was not cruel and unusual. Accordingly, she denied the motion. The Defendant was sentenced to seventeen years flat, consecutive to concurrent sentences of two years for aggravated assault and four years for attempted burglary.

## THE SENTENCE WAS DISPROPORTIONATE TO THE CRIME

The first question in an analysis of whether a sentence is cruel and unusual is whether the sentence is so long that it gives rise to the inference that it is grossly disproportionate to the crime. *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *State v. Bartlett*, 171 Ariz. 302, 306, 830 P.2d 823, 827 ("Bartlett II"), *cert. denied*, 506 U.S. 992, 113 S.Ct. 511, 121 L.Ed.2d 445 (1992). To resolve this question, it is necessary to consider a number of overlapping factors.

### The Harm Caused or Threatened to the Victim and Society

The direct harm to the victim in this case was the fear he underwent during his detention and the emotional effect of the expe-

rience. By any measure, these were not serious. The victim was detained for five minutes at most. He was afraid, and he showed it, but that fear surely could not have risen to the terror that the victims of many kidnappings must feel. For virtually the whole time he was restrained, the victim was in the presence of an adult with whom he was acquainted who bore him no ill will. Too, the victim was in a room with a number of other people who were no specific threat.

The victim suffered no particular emotional harm as a result of this crime. The trial judge, without elaboration, found to the contrary, but I do not think the record supports her in this regard. The victim's friend who observed him right after the event described the victim as "a little" shaken up, but conceded on cross-examination that he, the witness, had told defense counsel the victim was his "usual self" when he came home. The policeman who saw the victim right after the incident believed he was upset, but this distress varied in degree depending on whether the victim's mother was present or not, suggesting that it was not totally genuine. The police believed that the victim was a gang member although he denied it. If he was, that might have some bearing on his emotional tolerance for the conduct to which he was subjected. The victim's status and sophistication are subject to speculation, but it does not appear that he suffered much harm as the result of this incident.

The extent of harm threatened by the Defendant's actions is more subject to debate. While the Defendant said something about shooting or stabbing the victim, it is doubtful that he really intended anything so drastic because the threat was made in the presence of people who were not sympathetic to it. Nor did the Defendant have a weapon. Indeed, the trial judge inferred that the Defendant intended to beat the victim. Just how serious that beating might have turned out to be is open to speculation, but considering that it would almost certainly have occurred in the presence of people who were not in accord with the Defendant's actions, there is a good chance that it would not have been severe.

There is a possible indirect effect of the episode which must be mentioned. According to the victim's mother's statement in the presentence report, the victim was not able to go to school after Lujan's trial because he was the target of gang violence, and the victim's family feared that it would be the victim of a drive-by shooting. The source of these threats, and the reasons for them, are not clear, but even if they are related to the episode between Lujan and the victim and the ensuing trial, there is nothing to show that Lujan instigated this conduct or had any control over it.

### The Seriousness of the Crime

In the abstract, the kidnapping of a child is a serious crime. What the facts of this case highlight, however, is that the Arizona kidnapping statute is broadly drawn and when applied in conjunction with the provision relating to crimes against children, it can, at the option of the prosecutor, sweep in and punish relatively innocuous behavior in a brutal way. This factor, the breadth of the statutes, overlaps with a consideration of how other crimes are defined and punished in Arizona and in other jurisdictions, and is more conveniently dealt with in the section of this dissent which follows and which is a comparative analysis of the statutes.

### The Level of Violence

The level of violence employed in this crime was low. No weapons were used or displayed, and the victim was not struck and suffered no physical injury.

### The Defendant's Motive and Intent

Although this incident has the earmarks of a mere impulsive attention-getting gesture, neither the trial judge nor the judges of this court were or are compelled to give the incident so benign a cast. For the reasons explained above in my discussion of the harm threatened, however, it appears that the worst the Defendant intended was to beat up the victim as a Halloween prank. While the Defendant may be capable of stabbing and shooting people, it seems very unlikely that he really intended to do either on this occasion.

### The Defendant's Prior Record

The Defendant had one prior adult conviction for burglary. None of his fairly extensive problems with the juvenile authorities stemmed from any crimes of violence. He did plead no contest to a charge of aggravated assault that arose out of an incident that occurred after he was incarcerated for this kidnapping. The indictment in this later incident charges the Defendant with "knowingly touching" a jail employee with the intent to injure, insult or provoke her. There is nothing in the record that sheds any light at all on the facts underlying the indictment. The Defendant was sentenced to two years imprisonment for this assault consecutive to the sentence for kidnapping.

### Other Mitigating and Aggravating Factors

There are several strong mitigating factors, not subsumed in those discussed above, which bear consideration. One is the Defendant's youth. The other, even stronger, is the celerity with which Lujan released the victim unharmed.

The Defendant created a problem for himself in the face he presented to the authorities. He was coarse, defiant, unrepentant, and would have the world at large believe that he will do anything his gang, if indeed he is a gang member, wants him to do. He claims to have shot and stabbed people in the past. It would not be surprising if this attitude, and the fact that he is without friends or family to protest on his behalf, led to the decision to charge the Defendant in a manner that would keep him in confinement for as long as he had already lived.

I recognize that an offender's potential for violence is a legitimate charging and sentencing concern, but two things about the Defendant's attitude bear mention. First, as defense counsel pointed out in her sentencing memorandum, no one seriously believes that the Defendant has shot and stabbed people in the past. As far as the record shows, there is no corpus to which this inane teenage braggadocio can attach, and as far as can be discerned from the record, the authorities have never even so much as questioned him on the subject. Second, the Defendant, having been charged for a relatively minor inci-

dent, can hardly be faulted for voicing his outrage at what was being done to him in the name of the law on this occasion.

The Defendant's potential for violence and the role that it has played in this case bears mention. This appears to be a case of preventive detention. The Defendant's juvenile and adult probation officers considered him dangerous and wanted him locked up for seventeen years. So did the prosecutor and the police. One of the investigating detectives noted that this was not a serious crime but said, "when considering the defendant, he needs to be in prison for life." In giving her reasons for why she did not feel that the sentence was cruel and unusual, the trial judge alluded to the Defendant's prior record without saying anything about whether the Defendant was likely to commit dangerous crimes in the future and whether she was willing to impose so harsh a sentence for that reason.

It appears to me that the Defendant was locked up for a long time, not because of what he did, but because of what he might do in the future. I will not discuss the concept of preventive detention at length. For a variety of reasons it is, in my opinion, a dangerous and unsatisfactory doctrine. See Andrew von Hirsch, *Prediction of Criminal Conduct and Preventive Confinement of Convicted Persons,* 21 Buff.L.Rev. 717 (1972); Sam J. Ervin, Jr., *Foreword: Preventive Detention—A Step Backward for Criminal Justice,* 6 Harv. C.R.-C.L. L.Rev. 291 (1971); Alan M. Dershowitz, *Preventive Confinement: A Suggested Framework of Constitutional Analysis,* 51 Tex.L.Rev. 1277 (1973).

The prosecutor, probation officers and the police may well be correct in their belief that the Defendant is dangerous, and as I have already conceded, a potential for violence is a legitimate sentencing consideration. It is, however, a consideration which is often in direct competition with the fundamental notion that the punishment should fit the crime. In my opinion, even the worst person cannot, consistent with the constitution, be punished in a way that is grossly disproportionate to his crime. The sentence imposed on Lujan

crossed the line and gives rise to the inference that it is grossly disproportionate to the crime.

## COMPARISON OF LUJAN'S SENTENCE WITH OTHERS IMPOSED IN ARIZONA

Under *Harmelin* and *Bartlett II,* my conclusion that the sentence imposed on Lujan is grossly disproportionate to the crime must be double checked by comparing Lujan's sentence to sentences imposed on other persons convicted of crimes in Arizona. I will begin with a broad comparison of the sentences currently available in Arizona for a variety of serious crimes charged without the allegation that the victim was under fourteen years of age.

| OFFENSE | SENTENCE RANGE | | | PROBATION ELIGIBLE | PAROLE ELIGIBLE |
|---|---|---|---|---|---|
| 2nd Degree Murder | 10 | 15 | 20 [1] | No | No |
| Sexual Assault | 5.25 | 7 | 14 | No | No |
| Armed Robbery | | | | | |
| (Dangerous) | 7 | 10.5 | 21 | No | Yes ($\frac{2}{3}$) [2] |
| (Non–Dangerous) | 5.25 | 7 | 14 | Yes | Yes ($\frac{1}{2}$) [3] |
| Aggravated Assault | | | | | |
| (Dangerous) | 5 | 7.5 | 15 | No | Yes ($\frac{2}{3}$) |
| (Non–Dangerous) | 3.75 | 5 | 10 | Yes | Yes ($\frac{1}{2}$) |
| Manslaughter | | | | | |
| (Dangerous) | 5 | 7.5 | 15 | No | Yes ($\frac{2}{3}$) |

Lujan's crime is less serious than those listed. Where murder and manslaughter are concerned, the victim is dead. In sexual assault cases the victim has been raped. In cases of aggravated assault, the victim has suffered a serious physical injury, or the defendant used a weapon, or the assailant entered a private home to commit the assault, or the assailant was over the age of eighteen and the victim was under the age of fifteen, or the victim was a peace officer, school employee, or jail employee or the victim was assaulted while under restraint. Nonetheless, the presumptive sentence for all of these crimes is less than the sentence imposed on Lujan.

### Arizona Kidnapping Cases

A review of the reported kidnapping decisions does not reveal a single conviction for conduct even remotely like what the Defendant did in this case. The comparison includes cases that precede the adoption of the current statute and this, to some degree, dilutes the point to be made. So too, the analysis is complicated by the application of the statute relating to dangerous crimes against children. These problems notwithstanding, the comparison is enlightening.

In many of the reported decisions, kidnappings for which long sentences were imposed were charged in conjunction with other very serious crimes perpetrated against the victim of the kidnapping. *E.g., State v. Bernal,* 148 Ariz. 149, 713 P.2d 811 (App.1985) (consecutive term of twenty-one years for kidnapping where victim was murdered); *State v. Taylor,* 135 Ariz. 262, 660 P.2d 863 (1982) (concurrent term of twenty years for kidnapping where victim was raped); *State v. Whitney,* 159 Ariz. 476, 768 P.2d 638 (1989) (15.75 years for kidnapping concurrent to one sentence for dangerous aggravated assault and

---

1. The three figures represent the minimum, the presumptive, and the maximum terms available.

2. Eligible for parole after serving $\frac{2}{3}$ of sentence.

3. Eligible for parole after serving $\frac{1}{2}$ of sentence.

consecutive to sentence imposed in another case); *State v. Stough*, 137 Ariz. 121, 669 P.2d 99 (App.1983) (fifteen years for kidnapping where defendant posing as a law enforcement officer, stopped car and robbed occupants). In *State v. Flores*, 140 Ariz. 469, 475, 682 P.2d 1136, 1142 (App.1984), the court held that a sentence of fifteen years for kidnapping concurrent with fifteen years for aggravated assault was not cruel and unusual. The defendant, who had four prior felony convictions, had struck the victim and forced him at knifepoint to go to his automobile and turn over the title of the victim's car to the defendant. *Id.* at 470–71, 682 P.2d at 1137–38.

In several cases, even when these very serious crimes were intertwined with the kidnapping, the sentences imposed were not nearly as long as Lujan's. For example, in *State v. Williams*, 111 Ariz. 222, 223, 526 P.2d 1244, 1245 (1974), either inexplicably or for perhaps for reasons that do not appear in the report, the defendant who forced his victim into a bedroom at gunpoint and then raped her, received a suspended prison sentence with six months in jail. He received the same sentence for rape and for lewd and lascivious conduct. *Id.* In yet another case, *State v. Bice*, 127 Ariz. 312, 314, 620 P.2d 227, 229 (App.1980), the defendant, who was armed, gave the victim a ride and then drove around for an hour, telling her to keep her head down or he would blow it off. He eventually tied the victim up and raped her twice. For this he was sentenced to concurrent seven-year terms for sexual assault and kidnapping. *Id.*

Some reported cases do not fit this pattern of violent crimes against the person of the victim intertwined with the kidnapping. In two out of three of them, the sentences for kidnapping were less than that imposed on Lujan. In *State v. Newman*, 141 Ariz. 554, 555–56, 688 P.2d 180, 181–82 (1984), the defendant, an escaped convict, took a seventeen-year-old boy from his home at gunpoint and forced him to drive the defendant and his companions out of state. The victim was released unharmed after twelve hours. The Defendant received a sentence of twenty years for kidnapping consecutive

to sentences imposed for crimes against other victims and consecutive to a sentence for robbery, apparently of the victim of the kidnapping. *Id.* In *State v. Viramontes*, 163 Ariz. 334, 335–36, 788 P.2d 67, 68–69 (1990), the defendant received a ten-year sentence for leaving his infant daughter, born of another daughter, in a parking lot, and then calling police anonymously to advise them of the infant's whereabouts. In *State v. Toulouse*, 122 Ariz. 275, 276, 594 P.2d 529, 530 (1979), the defendant was sentenced to not less than five nor more than twelve years for forcing a person to drive him from Phoenix to Tucson at gunpoint.

### Arizona Cases Involving Crimes Against Children

The Defendant was convicted under the provisions of A.R.S. section 13–604.01(B), which provides in pertinent part as follows.

**B.** Except as otherwise provided in this section, a person who is at least eighteen years of age or who has been tried as an adult and who stands convicted of a dangerous crime against children in the first degree involving aggravated assault, molestation of a child, commercial sexual exploitation of a minor, sexual exploitation of a minor, child abuse or kidnapping shall be sentenced to a presumptive term of imprisonment of seventeen years.

A dangerous crime against children is one in which the victim is less than fifteen years of age. A.R.S. § 13–604.01(J)(1).

There are no cases reported under this statute that are similar to Lujan's case. The only one involving kidnapping charged as a dangerous crime against children concerned a father who had sexually molested his four young daughters. *State v. Arnoldi*, 176 Ariz. 236, 238–39, 860 P.2d 503, 505–06 (App.1993). The father was convicted of, among other things, two counts of kidnapping that were directly related to the molestations. He received a sentence of seventeen years and life on these counts. *Id.*

Four reported cases deal with the claim that the application of A.R.S. section 13–604.01 resulted in cruel and unusual punishment. In *State v. Kasten*, 170 Ariz. 224, 229, 823 P.2d 91, 96 (App.1991), the court held

that consecutive life sentences for nonconsensual sexual acts with a child extending over a period of three years were not cruel and unusual. In *State v. Jonas*, 164 Ariz. 242, 252, 792 P.2d 705, 715 (1990), a claim that a sentence of twenty-five years for selling marijuana to a child was cruel and unusual was rejected. The court focused on the defendant's record of violent criminal behavior and the serious social problem caused by drug abuse. In a two to one decision in *State v. DePiano*, 181 Ariz.Adv.Rep. 16, 17, —— Ariz. ——, ——, —— P.2d ——, —— (App. Jan. 10, 1995), with one judge dissenting, we upheld two consecutive sentences of seventeen years flat for a woman who, in an apparent effort at suicide and murder, took her two small sons into an enclosed garage, started an automobile engine, and allowed the garage to fill with smoke and exhaust fumes. In *State v. Bartlett*, 171 Ariz. 302, 303, 307, 830 P.2d 823, 824, 828 (1992), the supreme court held that a sentence of forty years without possibility of early release for consensual sexual conduct with two girls who were just under fifteen years of age was cruel and unusual in the absence of violence or a prior criminal record.

There is another facet of the Arizona Statutes which merits comment. Aggravated assault is another offense listed under A.R.S. section 13–604.01 which carries the same mandatory sentencing range as kidnapping. The aggravated assault statute, A.R.S. section 13–1204(A)(4), renders an assault aggravated where the assailant is eighteen years of age or older and commits the assault on a child of fifteen years or under. A person under eighteen cannot be charged with *aggravated* assault simply because the victim is fifteen or under. The legislature apparently did not want every schoolyard fight to trigger the harsh mandatory sentence called for

under the statute relating to dangerous crimes against children. Given the broad language of the kidnapping statute and the relatively innocuous conduct that can come within its ambit, it may well be mere legislative oversight that kidnapping is not treated in the same manner.

## COMPARISON OF LUJAN'S SENTENCE WITH THOSE THAT CAN BE IMPOSED IN OTHER STATES

The variety and complexity of the criminal codes of other states make an interjurisdictional comparison difficult and unsatisfactory.[4] The Defendant concedes that the sentencing scheme for a first offense kidnapping is similar to the terms of imprisonment which can be imposed in other jurisdictions. He argues, however, that Arizona's definition of kidnapping is broader than that of any other state. He also says that no other state has a statute as severe as A.R.S. section 13–604.01 relating to dangerous crimes against children. The interaction of these two statutes compels, in his words, "a Draconian punishment for a relatively harmless act" which is unique in the United States.

The part of the Arizona statute which is relevant to the Defendant's conduct in this case is unique in defining kidnapping as the restraint of another person with the intent to place the victim in "reasonable apprehension of imminent physical injury." Some jurisdictions, like New York, Missouri and Maine, have narrow definitions of kidnapping that require that the victim be restrained for a substantial period of time.[5] Some states criminalize restraining a person in a way that makes the victim believe that he will suffer *serious* injury. A number of states refer to the infliction of terror on the victim or placing the victim in fear of bodily injury as opposed to Arizona's "reasonable apprehen-

---

4. My exposition of this comparison between Arizona law and that of other states relies heavily on the Defendant's reply to the State's response to the motion to strike the application of A.R.S. § 13–604.01, which was filed in the trial court. It would have been better if the exhaustive analysis found in that reply had been included in the memorandum in support of the initial motion so that the State could have addressed it had it chosen to do so. There may be satisfactory reasons for why this was not done. In any event,

the State did not object to the reply, and it is a part of the record. The Defendant's trial lawyer, Maricopa County Deputy Public Defender Rena P. Glitsos, has done a thorough and professional job of protecting the Defendant's interests.

5. N.Y.Penal Law § 135.25(2) (McKinney 1994); Me.Rev.Stat.Ann. tit. 17–A, § 301(B)(2) (West 1994); Mo.Ann.Stat. § 565.110(1) (Vernon 1994).

sion of imminent physical injury."[6] The Alaska statute does not refer to terror or fear but makes it a crime to place the restrained victim in apprehension that he will be subjected to *serious* physical injury or sexual assault. Alaska Stat. § 11.41.300(a)(1)(C) (1994). Washington's statute requires an intent to inflict *extreme mental distress* on the restrained victim. Wash.Rev.Code Ann. § 9A.40.020(1)(d) (West 1994). The "reasonable apprehension of imminent physical injury" that is an element of kidnapping under the Arizona statute does appear to be something less than the "terror" required under the statutes of other states, is less than the "apprehension" of "serious" injury that is an element of the Alaska statute and is less than the intent to inflict "extreme mental distress" which is required under the Washington statute.

The allegation that the offense was a dangerous crime against children triggered a lengthy mandatory prison sentence without any possibility of early release. At least seven jurisdictions have special provisions for crimes against children that apply to kidnapping. Under the federal statute, 18 U.S.C. § 1201(g) (1995), the sentence for kidnapping is enhanced if the victim is under the age of eighteen *and the perpetrator is over the age of eighteen.* The apparent purpose of this requirement, like the similar Arizona aggravated assault statute, is to preclude the enhancement of penalties for relatively minor incidents between young people. Further, the enhancement provision of the federal statute only reaches more serious forms of kidnapping like maltreating the minor to a life-threatening degree. Under the federal statute, no enhancement would apply to Lujan.

Under California Penal Code section 208 (West Supp.1994), the penalty for kidnapping a person who is under the age of fourteen is five, eight or eleven years imprisonment.

Under Florida Statutes Annotated section 787.01(3)(a) (West 1994), a life term can be imposed for kidnapping a child under the age of thirteen if the defendant commits aggravated child abuse or a sexual offense upon the victim. No mandatory minimum sentence is required. Since the victim in the case before us was thirteen years of age, the provisions of the Florida statute would not have been triggered had Lujan's crime occurred in that state.

Under Maryland Crimes and Punishments Code Annotated section 338 (1994), a penalty of up to thirty years imprisonment can be imposed for kidnapping a child under the age of sixteen. There is no mandatory minimum sentence.

Montana has a separate statute relating to crimes against children who are under the age of sixteen, but it only requires a mandatory minimum sentence of thirty days imprisonment. Mont.Code Ann. § 46–18–201(7) (1993). There is an exception to any mandatory minimum sentence if the defendant was less than eighteen at the time of the offense. Mont.Code Ann. § 46–18–202(1).

New Jersey has a statute which would require a mandatory minimum sentence of twenty-five years without parole or twenty-five years to life with parole eligibility after service of twenty-five years if the victim is under sixteen years of age. The statute only applies if the kidnapper sexually assaults the victim, endangers the welfare of the victim, or sells or delivers the victim to another person for pecuniary gain in a manner that would prevent the return of the victim to a

6. Ala.Code § 13A–6–43(a)(5) (1994); Ark.Code Ann. § 5–11–102(a)(5) (Michie 1994); Conn.Gen. Stat.Ann. § 53a–92(a)(2)(C) (West 1994); Fla. Stat.Ann. § 787.01(1)(a)(3) (West 1994); Haw. Rev.Stat.Ann. § 707–720(1)(e) (Michie 1994); Kan.Stat.Ann. § 21.3420(c) (1993); Me.Rev.Stat. Ann. tit. 17–A, § 301(1)(A)(4) (West 1994); Minn. Stat.Ann. § 609.25(1)(3) (West 1994); Mo.Rev. Stat.Ann. § 565.110(1)(5) (Vernon 1994); Mont. Code Ann. § 45–5–303(1)(c) (1993); Neb.Rev. Stat. § 28–313(1)(c) (1994); N.H.Rev.Stat.Ann. § 633:1(I)(c) (1994); N.J.Stat.Ann. § 2C:13–1(b)(2) (West 1994); N.Y.Penal Law § 135.25(2)(c) (McKinney 1994); N.C.Gen.Stat. § 14–39(a)(3) (1994); N.D.Cent.Code § 12.1–18–01(1)(d) (1993); Ohio Rev.Code Ann. § 2905.01(A)(3) (Baldwin 1995); Or.Rev.Stat. § 163.235(1)(d) (1993); 18 Pa.Cons.Stat.Ann. § 2901(a)(3) (1995); S.D.Codified Laws Ann. § 22–19–1(3) (1995); Tenn.Code Ann. § 39–13–304(a)(3) (1994); Tex.Penal Code Ann. § 20.04(a)(5) (West 1993); Utah Code Ann. § 76–5–302(1)(c) (1995); Vt.Stat.Ann. tit. 13, § 2405(a)(1)(C) (1994); Wash.Rev.Code Ann. § 9A.40.020(1)(d) (West 1994); Wyo.Stat. § 6–2–201(a)(iii) (1995).

parent or guardian. N.J.Stat.Ann. § 2C:13–1(c)(2) (West 1994).

In Rhode Island, kidnapping a child under the age of sixteen carries a sentence of up to life imprisonment with a mandatory minimum of ten years. R.I.Gen.Laws § 11–26–1.4 (1994). Rhode Island's statute on kidnapping minors is arguably narrower than Arizona's. It requires that the kidnapping be with the intent to confine or imprison, sexually assault or molest, or abuse the child. *Id.*

The Tennessee statutes define kidnapping as *substantially* interfering with the victim's liberty in a way which exposes the victim to a *substantial* risk of bodily injury. Tenn.Code Ann. §§ 39–13–302, 39–13–303 (1994). Aggravated kidnapping includes, among other things, the added element of terrorizing the victim. Tenn.Code Ann. § 39–13–304(a)(3). The standard sentencing range for this crime is eight to twelve years imprisonment. Tenn.Code Ann. § 40–35–101. Especially aggravated kidnapping is aggravated kidnapping of, among other things, a person who is under thirteen years of age. Tenn.Code Ann. § 39–13–305. The standard range of sentence is fifteen to twenty-five years with a thirty percent reduction for release eligibility date. Tenn.Code Ann. § 40–35–101.

Utah Code Annotated section 76–5–301 (1995) defines kidnapping as restraining the victim for a substantial period or in circumstances exposing the victim to risk of serious bodily injury or detaining or restraining a minor without the consent of a parent or guardian. The penalty is an indeterminate sentence of from one to fifteen years. Utah Code Ann. § 76–3–203(2). Child kidnapping is defined as detaining a child under the age of fourteen with the intent to keep or conceal the child from a parent or guardian. Utah Code Ann. § 76–5–301.1. This crime, which carries a mandatory minimum sentence and can carry up to life in prison, would not apply to Lujan's conduct because Lujan did not have the requisite intent to satisfy the elements of the crime.

In summary, it appears that Arizona may well have the most severe punishment for this offense. While that does not necessarily

render the sentence grossly disproportionate to the crime, it serves to validate the conclusion that the punishment was grossly disproportionate to the crime in this case.

I would vacate the sentence and remand for resentencing without the application of the provisions of A.R.S. section 13–604.01. I concur with the majority in all other respects.